**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| D.T., a minor, by and through his parent/guardian and next friend ELISHA THORNTON, et al.; | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 24-cv-00390-SH |
| INDEPENDENT SCHOOL DISTRICT NO. 1-002, CREEK COUNTY, aka BRISTOW PUBLIC SCHOOLS; and FLOYD C. ROBINSON, an individual, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the Court is Defendant School District's motion for summary judgment relating to the alleged misconduct of a now-deceased employee. Some of the employee's actions were serious and resulted in criminal charges, but the School District is liable for its own unconstitutional actions—not those of others. Under the undisputed facts, no reasonable jury could find that Defendant School District maintained a policy that led to Plaintiffs' constitutional injury. The Court grants judgment to the School District on Plaintiffs' federal claims and declines to exercise supplemental jurisdiction over any remaining state-law claims.

## I. Procedural Background

Plaintiffs have sued the Independent School District No. 1-002 of Creek County, a/k/a Bristow Public Schools ("School District") relating to Defendant Floyd C. Robinson's ("Robinson's") filming of certain students in a school locker room on February 27, 2024, as well as his alleged prior sexual harassment of other students. (Dkt. No. 43.)

1

Plaintiffs[1] are either students who were present in the locker room on February 27, 2024, or those who allege prior harassment, or both.  As relevant here, Plaintiffs' claims against the School District include: (1) a claim for negligence on behalf of Plaintiffs #1–13[2] (*id.* ¶¶ 38—43); and (2) a claim under 42 U.S.C. § 1983 for violation of the due process and equal protection rights of all Plaintiffs (*id.* ¶¶ 55—71).[3]  Defendant School District now moves for summary judgment on these claims.  (Dkt. No. 79.)

## II.  Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is material if it "might affect the outcome of the suit under the governing law." *Id.*  As the court makes this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  To succeed on a motion for summary judgment, the movant must first show "that there is an absence of evidence to support the nonmoving party's case." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 484 (10th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  A party opposing summary judgment cannot simply allege there are

---

[1] One plaintiff, Braden Tinsley, was dismissed from this case on his own motion on March 19, 2026.  (Dkt. No. 78.)

[2] Remaining Plaintiffs #1–13 are DT, ME, MP, HP, TK, JY, PJ, LJ, NJ, BJ, BM, and ZB. (Dkt. No. 43 at 1.)

[3] The Court previously dismissed Plaintiffs' negligence per se claims for failure to state a claim and granted the voluntarily dismissal of Plaintiffs' claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1682(a).  (Dkt. Nos. 64, 78.)  The Court also granted the voluntary dismissal of Plaintiffs' claims against Defendant Robinson after his death.  (Dkt Nos. 54–55.)

disputed issues of fact but must support its assertions by citing to the record or by showing that the moving party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) ("Even though all doubts must be resolved in [the nonmovant's] favor, allegations alone will not defeat summary judgment.").  "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  The correct inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

In this case, both parties take issue with the other's statement of fact, and the Court will address those disputes first.

### III.   The Local Rules and Plaintiffs' Denials of Material Facts

As a preliminary matter, the Court notes that Plaintiffs have failed to comply with the local and federal rules in their effort to dispute the School District's statement of facts. Rule 56 requires a party asserting that a fact is genuinely disputed to support this assertion by "(A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  If a party does not properly address another party's fact assertions as required by Rule 56(c), a district court may:

> (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). The local rules clarify how facts must be supported or disputed, to ensure compliance with Rule 56(c). Specifically, the nonmovant must respond, "by correspondingly numbered paragraph, to the facts . . . not in dispute and shall state any fact that is disputed." LCvR 56-1(c). Each such individual statement by the nonmovant "shall be followed by citation, with particularity, to any evidentiary material that the party presents in support of its position" and "shall include references to the pages (including paragraphs or lines, where applicable) . . . ." LCvR 56-1(e). The local rules make it clear that the numbered paragraphs of disputed facts (with support) are <u>separate</u> from "any additional facts the nonmovant contends preclude judgment as a matter of law." LCvR 56-1(c).

Plaintiffs' response to the School District's undisputed facts consists of an unadorned list of numbered paragraphs that generally state either "Admitted" or "Denied." (Dkt. No. 82 at 6—9.[4]) This is insufficient to create a <u>disputed</u> issue of fact under the aforementioned federal or local rules. Thus, it would be appropriate to deem the School District's facts admitted. However, some of Plaintiffs' additional facts (*id*. at 9–17) are appropriately supported by evidentiary citations and would constitute a dispute of the School District's facts. In this instance, the Court declines to punish Plaintiffs for the dereliction of their counsel. Where the Court is able to discern a supported evidentiary dispute of a material fact, it will be included in the recitation of facts below. Counsel is warned that, in the future, briefs may be stricken or facts deemed admitted for failure to comply with these rules.

---

[4] Except where otherwise noted, page numbers refer to those in the court-provided header.

## IV.     School District's Objections to Plaintiffs' Additional Facts

The School District objects that many of Plaintiffs' proffered additional material facts are inadmissible as hearsay, as statements made without personal knowledge, or as conclusory statements.  (Dkt. No. 86 at 2.)

Where Plaintiffs state a fact that is not supported by the materials cited, it will be ignored.  *See* Fed. R. Civ. P. 56(e).  And where the evidentiary material cited itself contains hearsay or is factual testimony made without personal knowledge, it will be disregarded. At summary judgment, evidence need not be submitted "in a form that would be admissible at trial." *Celotex*, 477 U.S. at 324.  Nonetheless, "the content or substance of the evidence must be admissible."  *Thomas*, 48 F.3d at 485.  "Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *see also* Fed. R. Evid. 801(c) (noting that hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement").  By the same token, factual testimony is only admissible if there is evidence "sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602 (noting such evidence may consist of the witness's own testimony); *cf.* Fed. R. Civ. P. 56(c)(4) (noting that affidavits in support of a summary judgment brief "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify

5

on the matters stated").   The Court will not consider hearsay or speculative statements contained within the exhibits to the parties' briefing.[5]

## V.    Undisputed Facts

Unless otherwise noted, the following facts are undisputed as they relate to the legal determinations made in this order on summary judgment.   All inferences are drawn in Plaintiffs' favor.

### A.    General Background

The School District employed Robinson starting at least as early as 1992.  (Dkt. No. 79 at 8 ¶ 3.[6])  Over time, Defendant Robinson had served as a teacher, coach, or assistant coach; during the 2023–24 school year, he was an interim athletic/activities director.  (*Id.* ¶ 4.)

As part of his job in 2023–24, Robinson would sometimes assist with wrestling competitions.  (Dkt. No. 79 at 12 ¶ 30.)  Wrestling has weight classes; student wrestlers would weigh themselves throughout the season to see if they needed to add or cut weight, and wrestlers are required to weigh in prior to competitions.  (Dkt. No. 79-4 ¶¶ 5, 7.) Wrestlers would weigh in front of their coaches.  (*Id.* ¶ 6.)  In the past, it was common for

---

[5] This does not mean that all evidence of out-of-court statements will be disregarded.  For example, as noted below, the Court has considered firsthand accounts of statements made from students to the School District or its employees regarding Robinson, not for whether those statements were true, but for whether the school had received notice regarding Robinson's alleged actions.  The Court further has considered statements by Robinson as they constitute his actions, and not for the truth of those statements.

[6] Plaintiffs have explicitly and unequivocally admitted a large portion of the School District's statement of undisputed material facts (Dkt. No. 79 at 8–16).  Specifically, Plaintiffs have admitted the following paragraphs of Dkt. No. 79:  ¶¶ 1–7, 10, 12–13, 15– 16, 19, 23, 29–30, 32, 36, 38–43, 45–47, 50, 57–58.  (Dkt. No. 82 at 6–9.)  For these admitted facts, the Court will reference the paragraph of the School District's brief.  For any facts not admitted, the Court will reference only those facts supported by the accompanying record.

wrestlers to weigh themselves in the nude to have the lowest possible weight. (Dkt. No. 79-4 ¶ 8.) At least since the 2021–22 school year, however, wrestlers have been required to wear a singlet for competition weigh-ins. (*Id.* ¶ 9.) Robinson would bring the scale to out-of-town wrestling competitions for the high school wrestling team, and it was not uncommon for wrestlers to weigh themselves in his hotel room. (*Id.* ¶¶ 10–11.)

The School District has policies prohibiting sexual harassment. (Dkt. No. 79 at 8 ¶ 2 & Dkt. No. 79-1.) Prior to February 2024, there were no records in Robinson's employment file of any complaints of sexually inappropriate actions by Robinson or of adverse actions taken for inappropriate conduct by Robinson. (Dkt. No. 79-26 ¶ 5.)

Plaintiffs were all students at the School District during the 2023–24 school year. (Dkt. No. 79 at 8 ¶ 1.)

### B.    The February 2024 Locker Room Incident

On February 27, 2024, Plaintiffs TK, MP, KD, EB, SD, TF, JY, and HA were in the track locker room showering and changing for school when Defendant Robinson walked through the locker room. (Dkt. No. 79 at 9 ¶ 15.[7]) According to junior high track coach Scott Hall, it was common for coaches to walk through the locker room to make sure there was no horseplay and the team was getting ready.[8] (Dkt. No. 79-5 ¶¶ 1, 9.) The coaches

---

[7] "Locker Room Plaintiffs" are defined by the School District at Dkt. No 79 at 7. Plaintiffs do not dispute this definition. However, it appears that Plaintiff BM was also in the locker room on that date. (Dkt. No. 79-24 at 32:6–23.) BM was dressed, playing a game on his phone, and did not see Robinson or anything that happened. (*Id.* at 32:22–33:7, 34:7–20.) There are no other allegations relating to BM.

[8] Plaintiffs dispute this fact, arguing, "[i]n the past coaches never came in the room while students were showering." (Dkt. No. 82 at 10 ¶ 9.) However, the only evidence cited by Plaintiffs is the testimony of Chance Oldham, who testified as to conditions at least 30 years prior to the events at issue in this lawsuit. (*Id.* (citing Dkt. No. 82-4 at 13:4–10); *see also* Dkt. No. 82-4 at 10:23–11:3 (noting Oldham was in 7th grade in 1989).) The Court finds this does not create a material dispute as regular practice in the 2020s.

could also see the track locker room from their office. (Dkt. No. 79-7 at 68:1–15.[9])

However, on this occasion, several students saw that Robinson was holding his phone at his side with the screen facing his body as he walked through. (Dkt. No. 79 at 9 ¶ 16.) Several boys believed, based on seeing the record button on the screen, that Robinson was recording a video of the locker room. (*Id.*)

SD told Coach Wages that Robinson was recording the students.[10] (Dkt. No. 79-14 at 74:7–16.) Coach Wages told SD this was a really big accusation and SD needed to make sure it was true. (*Id.* at 74:17–20.) After SD again stated it was true, Coach Wages said they would talk about it when they got back to the school, and the students loaded up on the buses to go back to the school. (*Id.* at 74:21–75:1.) TF also remembers Coach Wages telling the students, after it all happened, "to kind of let it low, like not really say anything about it." (Dkt. No. 82-6 at 10:1–6.) JY similarly remembers the students telling Coach Wages about the recording, and him telling them not to tell anyone about it, not to tell their parents, and "he would get it handled." (Dkt. No. 79-6 at 47:22-25; Dkt. 82-11 at 48:1–3, 81:13–22.) HA recalls Coach Wages telling the boys that Robinson was an old man, it could have been an accident, and not to go around telling everybody and making them think he's doing [the rest of HA's testimony is cut off]. (Dkt. No. 82-14 at 86:12–25.)

EB and other boys were talking about "it" on the bus back to campus when Coach Scott Hall told the bus not to talk about it, which EB thought was because Coach Hall

---

[9] References to summary judgment exhibits containing deposition testimony will use the original pagination of the deposition with a "page:line" citation.

[10] Other than being called "Coach," there is no evidence in the record regarding Cori Wages or Coach Wages role or position at the School District.

"didn't know if we were being for real or joking."[11]  (Dkt. No. 79 at 8 ¶ 6; Dkt. No. 79-11 at 45:4–14, 22–25; Dkt. No. 82-9 at 46:1–6.)

After they returned to the main school, EB, SD, MP, and some of the other boys went to the middle school front office and reported the incident.  (Dkt. No. 79-11 at 45:16–21; Dkt. No. 82-9 at 46:7–15; Dkt. No. 79-14 at 75:1–3; Dkt. No. 79-12 at 101:16–24 (MP recalls someone saying they would "take care of it" but "nothing really happened there").)  SD and some other students were called into the principal's office to tell what happened.  (Dkt. No. 79-14 at 75:4–9, 85:3–25.)  Then, the school had students—including SD and EB—write statements of what happened.  (*Id.* at 75:8–9; Dkt. No. 79-11 at 47:1–9.)

By the next day, Robinson had been arrested for the anticipated charges of procuring and possessing child pornography and use of electronic equipment in a clandestine manner for an illegal or lascivious purpose.  (Dkt. No. 82-21 at 1.)

In their briefing, Plaintiffs present the probable cause affidavit for the truth of the matters asserted therein (Dkt. No. 82 at 9 ¶ 1), and the School District does not object to this use (*see generally* Dkt. No. 86 at 3–5).  According to the affidavit, the police found a deleted video on Robinson's phone that was taken on February 27, 2024, and lasted for two minutes and 30 seconds.  (Dkt. No. 82-21 at 3.)  The video included images of the locker room and depicted approximately 14 juvenile males in various stages of undress, including some entirely nude.  (*Id.*)  There is no evidence as to whether any of the individual Plaintiffs were depicted on the video or in what state of dress.  After Robinson died in April 2025, the criminal case was dismissed.  (Dkt. No. 79 at 10 ¶ 19.)

---

[11] Coach Hall denies receiving any reports of inappropriate behavior or misconduct regarding Robinson.  (Dkt. No. 79-5 ¶ 14.)

### C.    Robinson's Prior Conduct

After the February 2024 locker room incident, various students asserted that Robinson had previously acted in ways that were inappropriate or made them uncomfortable.

#### 1.    1989–1993

Travis Wycoff was a student at the School District in the late 1980s/early 1990s. (Dkt. No. 82-1 at ¶ 3.)  Wycoff states that, during the 1989–90 school year, Robinson would place a chair in an old locker room's shower entry; watch Wycoff and other students showering; and comment on their genitals.  (*Id.* ¶¶ 5–6.)  In a different field house, at an unknown time, Robinson would again watch Wycoff and other students showering or dressing.  (*Id.* ¶¶ 7–8.)  Twice, Robinson attempted to pull off Wycoff's towel.  (*Id.* ¶ 9.)  When that failed, Robinson placed Wycoff in a wrestling hold he called the "banana split," and touched and flicked Wycoff's genitals while commenting that Wycoff "better not get a boner because that would mean [Wycoff] enjoyed it."  (*Id.*)  Wycoff witnessed Robinson doing the same to other students.  (*Id.*)  During the 1992–93 school year, Robinson attempted to hit Wycoff in the genitals at a track meet.  (*Id.* ¶ 10.)  After the track meet, Wycoff reported "the above stated incidents/abuse" by Robinson to the high school principal at that time, Bob Stewart.  (*Id.* ¶ 11.)

Chance Oldham attended the School District during that same time period.  (Dkt. No. 82-4 at 6:8–17, 10:23–11:3).  Oldham testified that, during the 1989–90 and 1990–91 school years, Robinson would stand or pull up a chair in the locker room and watch the students shower.  (*Id.* at 11:23–12:9, 18:8–11.)  Robinson would also "pop[] kids on the butt with towels, stuff like that." (*Id.* at 12:12—15, 18:8–11.)  Oldham also recalls Robinson flicking his and others' privates.  (*Id.* at 18:19–19:14, 68:4–9.)  Oldham never made a

report with anyone at the School District or anyone else regarding Robinson until after Robinson was arrested in 2024. (Dkt. No. 86-1 at 47:8–48:10.)

### 2.    1993–2019

There are no allegations regarding Robinson during this 26-year period.

### 3.    2019–2024

More recent allegations regard Plaintiffs, and the Court will address each Plaintiff in turn. For most, the date of the allegations is not clear; where the dates are in the record, it is reflected below.

#### a.    DT

DT testified that, a few weeks before February 6, 2024, he was in the locker room with others showering and getting ready for school. (Dkt. No. 79-9 at 69:25–70:5; 70:22–24.) Robinson walked into the locker room with his phone to his ear, walked over to a locker, moved things around in the locker, and then walked out without taking anything. (Dkt. No. 79-9 at 70:24–71:17; 72:10–17.) At the time of his deposition, DT was not sure whether Robinson was talking on the phone or not. (*Id.* at 71:10–12.) DT had never seen Robinson in the locker room while using his phone before that incident. (*Id.* at 72:1–5.)

It appears DT's grandmother contacted the school on February 6, 2024, but there is no cognizable evidence in the record as to this. (Dkt. No. 79-9 at 66:4–13.) That day, Principal Seachris[12] brought DT in to talk about it. (*Id.* at 73:23–25.) DT told Seachris only that Robinson had come into the locker room looking for something and talking on his phone; he did not tell Seachris that Robinson did anything else or anything sexual. (*Id.* at 74:8–75:7.)

---

[12] It appears Seachris is the middle school principal. (Dkt. No. 79-14 at 85:2–14.)

### b.   ME

ME testified that he has been bald his entire life, and "random" people—generally students—will rub or slap his head. (Dkt. No. 79-21 at 60:6–25; Dkt. No. 82-19 at 62:1–63:5.) ME does not like this, but he does not tell people to stop, nor has he complained about it. (Dkt. No. 82-19 at 63:6–64:8.) At some point, Robinson also rubbed ME's head; none of the other coaches did that. (Dkt. No. 79-21 at 59:3–10; Dkt. No. 82-19 at 64:9–16.) There is nothing in the record that ME reported the head-rubbing to the School District.

### c.   MP

MP testified that, when he was in 7th grade, he was weighing in for wrestling when he was a bit over weight. (Dkt. No. 82-7 at 64:16–22.) MP joked that he was going to have to cut off his hair or his ear, when Robinson said, "I know something else we can cut off" and touched MP in an unspecified location with his cane. (*Id.* at 64:23–65:22.) MP did not report this or any other incident prior to February 27, 2024. (Dkt. No. 79-12 at 90:20–91:5.)

### d.   HP

HP testified that, when he was in 7th grade, he went down to the locker room at lunchtime to check his weight in his underwear. (Dkt. No. 79-20 at 30:19–24; Dkt. No. 82-13 at 56:3–12.) Robinson then came in, which scared HP because he had not seen anyone come in and the area was dimly lit. (Dkt. No. 79-20 at 30:25–31:3.) Robinson then sat there while HP weighed in and talked to him. (*Id.* at 31:4–6.)

It was a normal occurrence when HP was in 7th grade for Robinson to watch the students while they got ready. (*Id.* at 31:9–21.) Robinson would also put his arm around

HP and grab or rub HP's shoulders from HP's 7th grade year until he left in 2024.[13] (*Id.* at 33:1—25; Dkt. No. 82-13 at 34:1–13.)

Then, in the second week of February 2024, the wrestling team went to an out-of-town tournament. (Dkt. No. 82-13 at 37:1–14.) For such tournaments, the team brings a scale so they can check their weight. (*Id.* at 37:16–19.) At the tournament in February 2024, the weigh-ins were in Robinson's hotel room bathroom, and Robinson would sometimes watch the weigh-ins and would get up close so he could see the weight. (*Id.* at 37:20–21, 38:3–8, 42:13–20; Dkt. No. 79-20 at 40:1–17.) HP would either weigh in his underwear or naked, because he was trying to cut weight. (Dkt. No. 82-13 at 42:8, 42:21–43:1.) HP did not tell the coaches this made him uncomfortable or talk to the coaches about the weigh-ins. (*Id.* at 43:11–15, 44:16–20.) However, HP did make a joke when Coach Moore[14] told the students they would have to weigh in Robinson's room; HP told another student that he would go with the student who was weighing in to "make sure it's safe." (*Id.* at 43:15–44:5.) Coach Moore told HP to "shut the fuck up." (*Id.* at 44:5–15.)

---

[13] Ryan Powell, a parent, testified that at some point, possibly in 2022, he attended a meeting with other wrestler parents and Coach Moore, Coach "Rich," and "Roebuck." (Dkt. No. 82-15 at 24:19–25:21.) At the meeting, they discussed locker room etiquette, but he does not know whether Robinson was mentioned. (Dkt. No. 82-15 at 24:19—25:1.) Coach Richerson denies receiving any reports of inappropriate behavior or conduct by Robinson. (Dkt. No. 79-4 ¶¶ 15–16.) Powell also claims his wife made certain reports to the school, but it does not appear he has personal knowledge of these reports and is instead relying on hearsay from his wife about what was reported to the School District. (Dkt. No. 82-15 at 23:20–24:3; 26:10–24.)

[14] Other than the title "Coach," there is no evidence in the record regarding Coach Moore's role or position at the School District.

### e.    TK

TK had no contact with Robinson prior to the February 2024 locker room incident and does not appear to be asserting any claims based on events prior to that date.  (Dkt. No. 79-13 at 42:1–4.)

### f.    JY

JY testified that, at some time, Robinson put his arm around JY's shoulders with his arm draping over JY's front and then pulled JY closer when he tried to move away. (Dkt. No. 82-11 at 38:17–24, 42:6–25.)  JY made no complaints to any School District employees or anyone else about Robinson before the February 2024 locker room incident. (Dkt. No. 79-6 at 71:5–17.)

### g.    PJ

PJ testified that, when he was in 7th grade, he was checking his weight and "really close to weight."  (Dkt. No. 79-19 at 79:9–15.)  Robinson told PJ he could take off his underwear to weigh in.  (*Id.* at 79:17—19.)  PJ also heard Defendant Robinson "joke" to others "you know I wouldn't mind if you-all are getting on the scale naked." (*Id.* at 82:19—83:1.)  PJ testified that he told Coach Moore about this, but "he would just turn us down about it, just saying we were lying or stuff like that."  (*Id.* at 83:3–25.)

PJ also testified that, after basketball games, Robinson would, at times, sit in the locker room while PJ was getting dressed or people were showering. (*Id.* at 101:19—102:10.)  When PJ was in 7th grade, Robinson would sit on the benches where he could see students walking out of the shower.  (*Id.* at 110:6–21.)  PJ was present when a group of students told Coach Hall that Robinson was in the locker room for two days in a row when people were showering for track.  (Dkt. No. 82-18 at 112:4–113:6.)

In eighth grade, PJ told Coach Moore that Robinson was "still being weird," but he does not remember what else he said. (*Id.* at 119:3–22.) Then, a group including PJ told Coach Moore that Robinson was standing in the locker room while they were showering. (*Id.* at 119:23–120:7.) Coach Moore did not respond. (*Id.* at 120:8–11.) After practice the next day, Coach Moore lined PJ and others up and had them run sprints because they wanted to "keep joking around." (*Id.* at 120:11–15.) Later a group including PJ talked to Coach Moore again and had to run again. (*Id.* at 120:16–20.) PJ did not talk to anyone else at the School District about what he told Coach Moore. (*Id.* at 121:13–15.)

### h.    LJ

LJ testified that, during his 7th grade year, after the students had just gotten out of the showers, Robinson came into the locker room, sat down by him and others, and put his phone to his ear without talking. (Dkt. No. 79-22 at 51:8–19.)  Another time, LJ saw Robinson tell another student who was weighing in, "If you get naked, then you'll weigh less." (*Id.* at 53:15–22; Dkt. No. 82-17 at 54:2–4.) The student was under weight and did not remove his undergarments. (Dkt. No. 82-17 at 54:5–6, 17–21.) LJ told Coach Hall about this and recalls Hall telling him, "That's just Coach Rob. That's how he is." (*Id.* at 58:1–14.) LJ has seen other students weigh naked to try and make weight. (Dkt. No. 79-22 at 59:9–13.)

### i.    NJ

NJ testified that, during his 7th and 8th grade years, Robinson was "always" sitting in the locker room while the students showered and changed. (Dkt. No. 79-23 at 37:2–

21.)  NJ never reported any discomfort with Robinson to anyone with the school.[15]  (*Id.* at 42:21–43:7.)

### j.    BJ

BJ testified that, even though BJ wrestled in the heavyweight division, Robinson instructed him to weigh in and told him he would lower his weight without underwear. (Dkt. No. 79-18 at 26:6—21.)  There is nothing in the record showing BJ reported this to anyone at the school district.

BJ also said, when demonstrating wrestling moves, Robinson grabbed him on his chest and near his buttocks in a way that BJ felt was not right and with other coaches present.[16]  (*Id.* at 27:1—21, 32:15–20; Dkt. No. 82-16 at 33:9–34:8.)  BJ told Coach Moore and head wrestling coach Dustin Richerson about the wrestling moves, and they told him if he kept coming up there they would make him do towel pushes as a punishment.  (Dkt. No. 79 at 8 ¶ 5; Dkt. No. 82-16 at 34:8–34:24; Dkt. No. 79-18 at 35:1–4.)

### k.    BM

There is nothing in the record regarding any interactions between BM and Robinson before the February 2024 locker room incident, and it appears BM is not asserting any claims prior to that date.

---

[15] Plaintiffs present NJ's testimony for the proposition that NJ's friend's older brothers made a report to Superintendent Curtis Shelton.  (Dkt. No. 82 at 11 ¶ 11.)  However, NJ did not witness any such report but is, instead, relating something his friend told him that the brothers had told that friend.  (Dkt. No. 82-20 at 44:24–46:9.)  The truth of the brothers' statements and the truth of the friend's recounting of those brothers' statements are both inadmissible hearsay.  In any event, the report is only described as "they was like experiencing stuff with Coach Rob."  (*Id.* at 45:15–16.)

[16] Coach Richerson states he was present when Robinson demonstrated wrestling moves generally and denies seeing Robinson touch a student in an inappropriate manner.  (Dkt. No. 79-4 ¶¶ 12–13.)

### l.    ZB

ZB testified that, when he was in 7th grade during the 2019—20 school year, Robinson made ZB feel uncomfortable by coming into the locker room while ZB and his teammates were changing and showering.  (Dkt. No. 79-17 at 74:24—75:13.)  Robinson would also grab ZB, hug him, say "hi," and rub his hair; Robinson acted that way with "a lot of the boys." (*Id.* at 81:11—82:20.)  Then, during ZB's 9th grade year, ZB hurt his knee, and Robinson rubbed his other thigh "towards [his] groin area." (Dkt. No. 82-8 at 88:4—21.)  While Robinson was rubbing ZB's thigh, there was the sound of a door opening, and Robinson then stopped and left.  (*Id.* at 88:23–24.)  ZB did not report Robinson's behavior to anyone at the School District.  (*Id.* at 94:16–23.)

### m.    KD

KD testified that, when he was in 8th grade, Robinson came into the wrestling locker room while students were showering or in towels.  (Dkt. No. 82-12 at 35:16–36:5.)  Robinson had his phone to his head, said he was on a phone call, and said someone had called needing some wrestling shoes.  (*Id.*)  Robinson asked a student wearing a towel to climb up the locker and get the shoes with both hands.  (*Id.* at 36:7–12.)  The student did not take off his towel, and Robinson left.  (*Id.* at 36:14–22.)  There is no evidence in the record that KD reported this incident to anyone.

### n.    HA

HA testified that Robinson would grab students by the back of their neck and talk to them when they were weighing in for wrestling.  (Dkt. No. 79-7 at 61:1–7.)  One time, when HA was weighing in his underwear and not making weight, Robinson told him he might make weight if he removed his underwear—a suggestion HA did not take.  (*Id.* at

61:8—18.)  HA did not report any of Robinson's behavior to anyone at the School District before the 2024 locker room incident.  (*Id*. at 70:4–7.)

### o.    EB

EB testified that, prior to the February 2024 locker room incident, Robinson had never done anything that made him uncomfortable, and he does not appear to be asserting any claims prior to that date. (Dkt. No. 79-11 at 47:22–48:4.)

### p.    SD

SD testified that the February 2024 locker room incident was the only time Robinson had acted inappropriately around him, and he does not appear to be asserting any claims prior to that date.  (Dkt. No. 79-14 at 97:18–23.)

### q.    TF

TF testified that, other than the February 2024 locker room incident, he had no interactions with Robinson that were inappropriate, and he does not appear to be asserting any claims prior to that date.  (Dkt. No. 79-15 at 18:24–19:6.)

## VI.    Analysis

### A.    Plaintiffs' Federal Claims under § 1983

Federal law provides a private cause of action for persons who are deprived of their Federal constitutional rights by another person acting under color of State law.  42 U.S.C. § 1983.  Plaintiffs claim they were deprived of their due process and equal protection rights.[17]

---

[17] "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

Municipal entities—including school districts—are persons subject to § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 688–89 (1978) (municipalities); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009) (referring to school district as a type of municipal entity).

However, state actors are liable under § 1983 for their <u>own</u> acts, not those of others. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (noting vicarious liability is inapplicable to § 1983 claims). As such, a § 1983 plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* For municipal entities like the School District, this means the constitutional injury must be inflicted by the execution of that entity's policy or custom. *Monell*, 436 U.S. at 694. To succeed on a § 1983 claim, Plaintiffs must show "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (noting that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee").

The School District argues that the undisputed facts fail to show a municipal policy or custom, that the policy or custom caused a violation of Plaintiffs' constitutional rights, or that the School District acted with the requisite state of mind.

### 1.    The Existence of a Policy or Custom

The parties agree that the School District's policy or custom may be proven in a variety of ways.

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation modified). Plaintiffs argue there was an informal custom, ratification, and failure to train or supervise that caused their injuries. (Dkt. No. 82 at 19—20.)

### a.     Informal Custom

When a student asserts a § 1983 claim based on an informal custom, the plaintiff must prove (1) there existed a continuing, persistent, and widespread practice of unconstitutional misconduct by school employees; (2) the school's policymaking officials had notice of that particular misconduct and were deliberately indifferent or tacitly approved it; and (3) the plaintiff was injured by that custom, which was the moving force behind the acts. *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993); *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008) (same). "Although the Tenth Circuit has never adopted a bright-line rule as to the number of similar incidents required to establish the existence of a custom, most courts, including the Tenth Circuit, have concluded that a single incident—or even three incidents—do not suffice." *S.R. v. Tri-Cnty. Interlocal CO-OP Indep. Sch. Dist.*, No. 6:23-CV-255-JAR, 2025 WL 845117, at *6 (E.D. Okla. Mar. 18, 2025) (collecting cases).

Here, Plaintiffs have shown that one individual, Robinson, repeatedly acted in a way they allege sexually harassed students in the few years leading up to the 2024 locker

room incident, and that he acted similarly with two students decades earlier. Many of the complaints were not of an overtly sexual nature. Most were completely unknown to anyone else at the School District.[18] Exceptions include the report by Wycoff in 1993 that Robinson had watched him and others showering or dressing, flicked his genitals during wrestling while making an inappropriate comment, and attempted to hit him in the genitals at a track meet. (*Supra* § V(C)(1).) After that report, there was no notice to anyone at the School District of any misconduct for at least 26 years. Then, (1) DT reported to Principal Seachris on February 6, 2024, that Robinson had walked into the locker room while talking on his phone (*supra* § V(C)(3)(a)); (2) PJ reported to Coaches Moore and Hall that Robinson told students they could weigh in naked and that he was standing in the locker room while they were showering (*supra* § V(C)(3)(g)); (3) LJ reported to Coach Hall that Robinson told a student he would weigh less if he weighed in naked (*supra* § V(C)(3)(h)); and (4) BJ complained to Coaches Moore and Richerson that he felt Robinson's wrestling moves were not appropriate (*supra* § V(C)(3)(j)).[19]

Even for these reports, there is no evidence that the School District's policymaking officials knew about them. To determine whether an official is a final policymaker, courts

---

[18] This includes all of the incidents alleged by Chase Oldham in 1989–1991 (*supra* § V(C)(1)); all of the incidents alleged by ME, MP, JY, NJ, ZB, KD, and HA (*supra* §§ V(C)(3)(b)–(c), (f), (i), (l)–(n)); and some of the incidents alleged by BJ (*supra* § V(C)(3)(j)). Plaintiffs TK, BM, EB, SD, and TF do not allege that Robinson acted inappropriately around them before the 2024 locker room incident. (*Supra* §§ V(C)(3)(e), (k), (o)–(q).)

[19] Plaintiffs also point to Robinson's purported nicknames. Oldham testified he heard Robinson be called "Freaky Floyd" or "Funky Floyd." (Dkt. No. 82-4 at 13:11–25.) JY testified he had heard people call Robinson "Freaky Floyd" but without any explanation. (Dkt. No. 79-6 at 63:16–21, 67:3–8.) One parent said the "kids" called Robinson "Creepy Floyd." (Dkt. No. 82-15 at 35:12–22.) There is no evidence these nicknames were known to the School District or its employees, nor do they alone indicate inappropriate action by Robinson.

consider "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (citation modified). The relevant question is whether the school employee has "'policymaking' authority, not 'decision making' authority." *Rubio v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1302 (D. Kan. 2006) (collecting cases); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").[20] Whether an official has "final policymaking authority" is a question of state law. *Praprotnik*, 485 U.S. at 123. If the employee's decision on a matter needs approval of another governing body, then the employee cannot be considered the final policymaker for that matter. *Young v. City of Idabel*, 721 F. App'x 789, 802 (10th Cir. 2018).[21]

Under Oklahoma law, the governing body of a school district is its board of education. *See* Okla. Stat. tit. 70, § 5-106(A). However, other Oklahoma school officials may be considered final policymakers if they are shown to have the appropriate authority. *See, e.g., Najera v. Indep. Sch. Dist. of Stroud No. I-54 of Lincoln Cnty.*, No. CIV-14-657-R, 2015 WL 4310552, at *5 (W.D. Okla. July 14, 2015) (finding superintendent was final policymaker in § 1983 sexual harassment case, where he served as chief executive officer

---

[20] While *Praprotnik* was a plurality opinion, the Tenth Circuit has found that it can be fairly read as binding precedent. *See Randle*, 69 F.3d at 448 n.9.

[21] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

of the district and was charged with implementing the district's sexual harassment policy).  But here, there is no evidence in the record that anyone other than the school board or certain designated employees had policymaking authority regarding sexual harassment at the Bristow School District.[22]  There is no evidence that Principal Seachris or the coaches served in any of these roles.  The Court cannot assume facts not in evidence and cannot find that the School District's policymakers knew of the limited instances reported before the February 2024 locker room incident.

The evidence in the record fails to show either a widespread practice or that the School District's policymakers tacitly approved the practice (or were deliberately indifferent to it) under Tenth Circuit precedent.  For example, in *Gates*, there was a prior report to the school board that the teacher was "chasing" another student who was "infatuated" with him and he had an "affair" with her; the school board president believed "there was a chance that [the teacher] may have done so with other high school girls" and heard "scattered comments from a high school student" that the teacher was "chasing after" the plaintiff; and the offending teacher admitted to a fellow teacher he had sex with yet another student. *Gates*, 996 F.2d at 1037–38, 1042.  The Tenth Circuit found "the evidence would not support a finding of the existence of a pattern of persistent and widespread unconstitutional practices that had become so permanent and well-settled as to have the force and effect of law." *Id.* at 1042.  The court also found the evidence did "not demonstrate that the [school district] had notice of a pattern of unconstitutional acts,

---

[22] The School District presented evidence it had sexual harassment policy, which Plaintiffs admitted.  (*See* Dkt. No. 79 at 8 ¶ 2; Dkt. No. 82 at 6 ¶ 2.)  The policy requires reports of harassment be passed up to a Title IX coordinator, with an interim decision on such reports made by the Title IX coordinator or an investigator, subject to a final decision by the appeal decisionmaker.  (Dkt. No. 79-1 at 2–4.)

or that [it] displayed deliberate indifference or tacitly authorized the violation of plaintiff's constitutional rights." *Id.*

The evidence in this case is more lacking than that in *Gates.* As in *Gates*, there are allegations of actions by only one employee. But unlike the allegations in *Gates*, many of the allegations here are nonsexual, and there is no evidence that any of Robinson's alleged misconduct was known to the policymakers at the School District. The Court finds Plaintiffs have failed to demonstrate an informal policy on which they could base a § 1983 claim. *See also Doe No. 1 v. Boulder Valley Sch. Dist. No. Re-2*, No. 11-CV-02107-PAB-KLM, 2012 WL 4378162, at *8 (D. Colo. Sept. 25, 2012) (no "widespread or persistent unlawful conduct" where plaintiffs alleged "rumors among the student body about [a student teacher's] relationships with students" and not that "other school district employees were also having unlawful relationships with students."), *aff'd,* 523 F. App'x 514 (10th Cir. 2013); *Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir. 1989) (no informal custom of sexual harassment where a supervisor "engaged in isolated and sporadic acts of sexual harassment directed at a few specific female members of his staff" and there was "no indication that sexual harassment by others in the office was tolerated or occurred"). *But cf. Aubert v. Cent. N.M. Cmty. Coll.*, No. 18-CV-0118-WJ-LF, 2019 WL 1239435, at *9 (D.N.M. Mar. 18, 2019) (finding plaintiff alleged informal custom where there were no Title IX policies and the institution failed to respond to the plaintiff's complaints in several instances).

### b.    Ratification

Plaintiffs also fail to show "the ratification by . . . final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Bryson*, 627 F.3d at 788 (citation

modified).  As noted above, the only policymakers established by the evidence in this case are the School District's school board and certain official(s) listed in the sexual harassment policy.  And again, as noted above, Plaintiffs have not shown those policymakers delegated any decisions to their subordinates and then ratified those decisions.[23]  Plaintiffs have presented no evidence from which a jury could find ratification.

### c.   Failure to Train or Supervise

Finally, Plaintiffs have not put forth evidence that the School District failed to adequately train or supervise employees.  Failure to adequately train or supervise employees can constitute an official policy, "so long as that failure results from deliberate indifference to the injuries that may be caused." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023) (citation modified).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "It is not enough to [show] general deficiencies in a particular training program.  Rather, a plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury . . . ." *Keith v. Koerner*, 843 F.3d 833, 838–39 (10th Cir. 2016) (citation modified).

The parties conducted discovery for over a year in this case, but Plaintiffs put forward no facts regarding the (lack of) training provided by the School District to its staff, or how staff were supervised.  Plaintiffs do not even identify what training or supervision they believe was inadequate—was it training of employees like Robinson on how they

---

[23] The parties treat all Plaintiffs identically in their arguments, and so will the Court. However, for some of these issues—like prior notice and ratification—there would be serious questions based on the timing of any alleged notification and the date of the alleged harms committed against those Plaintiffs.

should act or was it training on whether or how student complaints should be reported under the sexual harassment policy? Instead, Plaintiffs appear to assume that, because Robinson's actions occurred, any training or supervision <u>must</u> have been deficient. This omission by itself dooms Plaintiffs' arguments on failure to train or supervise.

But Plaintiffs also fail to show deliberate indifference to any training deficiencies. "To satisfy the stringent deliberate indifference standard, a pattern of similar constitutional violations by untrained employees is ordinarily necessary."[24] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. Plaintiffs put forward various instances of Robinson's conduct and a few instances of school staff learning of that conduct and—given Robinson's clean record—not reporting that conduct up the chain of leadership or to the Title IX coordinator. But Plaintiffs fail to show notice to the School District's policymakers of these events or that the training was deficient.

Plaintiffs have failed to show a municipal policy or custom that led to their injuries under any theory, and their § 1983 claims against the School District fail for lack of this essential element.[25]

---

[24] "Deliberate indifference may [also] be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Waller*, 932 F.3d at 1284. As Plaintiffs provide no evidence of the School District's action or inaction, they cannot show that a violation of federal rights was a predictable or plainly obvious consequence.

[25] Although much of the parties' *Monell* arguments center around the due process claims, the parties agree that a failure to demonstrate any policy or custom that led to Plaintiffs' injuries similarly defeats equal protection claims. (Dkt. No. 79 at 28; Dkt. No 82 at 27.)

### 2.    Substantive Due Process

Because Plaintiffs have failed to show any policy that led to their injuries, they cannot establish the School District's liability under 42 U.S.C. § 1983. *See Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 788–89 (10th Cir. 2013) (applying *Monell* to a substantive due process claim). But even had Plaintiffs satisfied the requirements for municipal liability under *Monell*, their substantive due process claim would still be foreclosed by their failure to show affirmative action that shocks the conscious. A substantive due process violation occurs when "government action deprives a person of life, liberty, or property in a manner so arbitrary it 'shocks the conscience.'" *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Plaintiffs assert the School District violated their substantive due process rights under the "danger creation" theory.

Under that theory, a state actor can be liable for the acts of a third party, where the state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). To prevail on this theory, a plaintiff must "establish as a threshold matter (1) private violence, and (2) affirmative conduct on the part of the state in placing the plaintiff in danger." *Hernandez v. Ridley*, 734 F.3d 1254, 1259 (10th Cir. 2013). Then, the plaintiff "must also satisfy all elements of a six-part test:

> (1) defendant created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or

---

*See also Rost*, 511 F.3d at 1124 ("A school district's liability for sexual harassment under the Equal Protection clause is analyzed under a municipal liability framework.").

known; (5) defendant[] acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Id.* (citation modified).  Plaintiffs' claims fail on multiple fronts.

First, putting aside whether any private violence occurred, Plaintiffs fail to show "affirmative conduct" on behalf of the School District and fail at the threshold level. Affirmative conduct typically involves "conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration" and is "directed at a discrete plaintiff rather than at the public at large." *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002).  "[M]ere negligence or inaction is not enough." *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013).

As noted above, Plaintiffs' complaints center around the School District's inaction. In their response brief, however, Plaintiffs argue the School District "affirmatively increased the risk to Plaintiffs by promoting Robinson to interim athletic director, thereby expanding his authority and access to student-athletes."[26]  (Dkt. No. 82 at 24.)  There is no evidence in the record that Robinson's job as interim athletic director expanded his access to students or otherwise played a role in the alleged events.  The undisputed facts are that Robinson had been, at various times, a coach of wrestling and track (Dkt. No. 79 at 8 ¶ 4) and his alleged wrongdoing occurred when engaged with the wrestling and track teams.  Moreover, Robinson's promotion would not impose an immediate threat of harm

---

[26] Plaintiffs also argue, in passing, that the School District affirmatively acted by "punishing students who reported misconduct." (Dkt. No. 82 at 24.) Plaintiffs appear to base this on the testimony of PJ and BJ.  PJ testified Coach Moore had him and others run sprints the day after complaining about Robinson being in the locker room and then again on the same day as another complaint.  (Dkt. No. 82-18 at 119:23–120:20.)  BJ testified that Coaches Moore and Richerson threatened him with towel pushes if he did not stop complaining about the way Robinson demonstrated wrestling moves.  (82-16 at 34:5–24.)  Plaintiffs do not provide legal authority for attributing these acts to the School District.

but, instead, a threat of an indefinite range and duration. *See Ruiz*, 299 F.3d at 1183 (noting the improper licensure of daycare facility did not meet the affirmative conduct requirement for this reason).

Second, even if Plaintiffs passed the threshold inquiry, they fail to show the School District's conduct shocks the conscious. "The 'shocks the conscience' requirement for a danger-creation claim is grounded in three principles: (1) restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local bodies in making decisions impacting public safety." *Kerns v. Indep. Sch. Dist. No. 31*, 984 F. Supp. 2d 1144, 1151 (N.D. Okla. 2013) (citing *Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1262 (10th Cir. 1998)). For this element, a plaintiff must prove that the state action was not only intentional or reckless but it also had a "degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Armijo*, 159 F.3d at 1262 (citation modified). Whether state conduct shocks the conscience is a question of law for the Court. *See Perez v. Unified Gov't of Wyandotte Cnty./Kansas City,* 432 F.3d 1163, 1168 n.4 (10th Cir. 2005) (citing *Terrell v. Larson,* 396 F.3d 975, 981 (8th Cir. 2005)).

Here, the argued affirmative conduct consisted of placing Robinson in his role and appearing to punish (or threatening to punish) some individual students for complaining about Robinson's presence in the locker room and the way he touched a student while demonstrating wrestling moves. This does not arise to the level of "brutal and inhumane abuse of official power" that shocks the conscious. *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist.*, No. 19, 77 F.3d 1253, 1256–57 (10th Cir. 1996) (citation modified).

29

### B.  Plaintiffs #1–13's State Law Claims for Negligence

Finally, the School District argues that, if the federal claims are dismissed, the Court should decline to exercise jurisdiction over the remaining state-law claims. Plaintiffs do not dispute this portion of the School District's argument.  (Dkt. No. 82 at 28.)  The Court finds it is appropriate to decline jurisdiction.

By statute, when a district court has original jurisdiction over a civil action, it also has supplemental jurisdiction over related claims that form part of the same case or controversy.  28 U.S.C. § 1367(a).  However, the court may decline to exercise that jurisdiction if it has dismissed all the claims over which it had original jurisdiction.  *Id.* § 1367(c)(3).  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (citation modified)).

Here, no party argues the Court should retain jurisdiction should the federal claims fail, and there do not appear to be any compelling reasons to do so.  The Court will therefore dismiss the remaining negligence claims of Plaintiffs #1–13 without prejudice.

## VII.  Conclusion

IT IS THEREFORE ORDERED that *Defendant's Motion for Summary Judgment* (Dkt. No. 79) is GRANTED.  Plaintiffs' claims under 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE.  Plaintiffs #1–13's state-law negligence claims are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that *Defendant School District's Omnibus Motion in Limine* (Dkt. No. 83) is DENIED as MOOT.

ORDERED this 8th day of June, 2026.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT